## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DOMO, INC., a Utah corporation,<br><br>    Plaintiff,<br>v.<br><br>GROW, INC., a Delaware corporation, and ROB NELSON, an individual,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:17-cv-812<br><br>District Judge Jill N. Parrish |

Before the court is Defendants' Motion to Dismiss (ECF No. 23). For the reasons below, Defendants' motion is GRANTED with respect to Plaintiff's federal claims. The remaining state-law claims are dismissed for lack of subject-matter jurisdiction.

## I.    BACKGROUND

Plaintiff Domo, Inc. is a Utah company that develops business intelligence software and markets it in the United States and abroad. Defendant Rob Nelson is a former Chief Technology Officer of AFS, a transportation-cost-management company operating out of Shreveport, Louisiana.

While Nelson worked at AFS, Domo contacted him multiple times to promote Domo's products. On September 12, 2013, Nelson finally responded, represented himself as a potential buyer on behalf of AFS, and requested Domo's demonstration materials. Between October 11–14, 2013, Domo provided Nelson with a live demonstration, single-use videos for his AFS team, and a slide show of the Domo platform. After the demonstration, Nelson informed Domo that he would meet with AFS officers and board members to seek approval to purchase the Domo

platform. But when Domo attempted to contact Nelson at AFS in late October/early November of 2013, Domo learned that Nelson had left AFS.

In January 2014, Nelson founded Defendant Grow, Inc., which sells business intelligence software very similar to Domo's product. The similarities include a dashboard design with individual tiles that can be moved, enlarged, or reduced in size, and various other features that look similar to the features of Domo's design. Grow targets the same market of customers but sells its software at prices significantly lower than those of Domo. Below are screenshots of Domo and Grow software submitted by Domo as Exhibits A and B, respectively.



*Exhibit A: Screenshot of Domo's Product*



*Exhibit B: Screenshot of Grow's Product*

Because Grow markets its product at lower prices, Domo alleges that it lost customers and business opportunities to Grow. Domo filed this complaint against both Grow and Nelson (collectively, "Grow"). Domo believes Nelson misrepresented AFS's interest in Domo's product and that he used Domo's demonstrations to develop his own platform. Domo asserts that Nelson defrauded Domo by misrepresentations and omissions when he obtained information about the Domo platform. Domo also alleges that Grow's use of Domo's trade dress causes customer confusion as to the source of the software. Additionally, Domo asserts that its platform is protected by U.S. Patent No. 8,914,740 ("the '740 patent"), which claims a certain method of displaying stacked bar graphs in computer-implemented presentations of data. Domo alleges that Grow's product infringes the '740 patent. Finally, Domo asserts that Grow's actions give rise to

claims for tortious interference, unfair competition, and deceptive trade practices under Utah law.

Domo seeks compensatory damages, punitive damages, pre- and post-judgment interest, and attorneys' fees under 15 U.S.C. § 1117 and Utah Code Ann. § 13-11a-4(2)(c). Domo also seeks a preliminary and permanent injunction against Grow's use of its competing platform under § 34(a) of the Lanham Act, 15 U.S.C. § 1116(a), and Utah Code Ann. § 13-11a-4(2)(a).

Defendant Grow moves the court to dismiss all causes of action for failure to properly state a claim under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## II.     MOTION STANDARD

Under Rule 12(b)(6), a defendant may move to dismiss a claim when the plaintiff fails to state a claim upon which relief can be granted. The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties may present at trial but to "assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1108 (10th Cir. 1991) (citing *Scheuer v. Rhodes*, 416 U.S. 232 (1974)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff has alleged facts that allow "the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Under *Iqbal*, the court must first identify "the allegations in the complaint that are not entitled to the assumption of truth," including allegations that are legal conclusions, bare assertions, or merely conclusory. *Id.* at 680–81. The court must then consider the factual allegations that are entitled to the assumption of truth "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, the plaintiff's claim survives the motion to dismiss. *Id.* at 679. A complaint is insufficient if it contains "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 678.

## III.    TRADE DRESS INFRINGEMENT

"A trade dress is an object's 'total image and overall appearance,' and 'may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1146 (10th Cir. 2016) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 765 n.1 (1992)). "A party may register a trade dress with the United States Patent and Trademark Officer under § 2 of the Lanham Act, 15 U.S.C. § 1052." *Id.* at 1147 (citing *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209–10 (2000)). Domo alleges its trade dress is unregistered, but failure to register does not preclude its protectability. *Id.*

Grow's business intelligence software bears uncanny resemblance to the Domo platform. Domo argues that Grow's software infringes Domo's trade dress under § 43(a) of the Lanham Act.

> To obtain relief under § 43(a), a plaintiff must show: "(1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional."

*Id.* (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (2007)). Failure to allege any of these three requirements is fatal to Domo's trade dress infringement claim. Here,

Domo sufficiently alleges a likelihood of confusion. However, it does not sufficiently allege distinctiveness or nonfunctionality.

### A. DISTINCTIVENESS

Trade dress must either be inherently distinctive or become distinctive through acquiring secondary meaning. *Id.* However, Domo does not sufficiently allege that its trade dress is either inherently distinctive or that it became distinctive through acquiring secondary meaning.

### 1. Inherent Distinctiveness

"A trade dress is inherently distinctive if its 'intrinsic nature serves to identify a particular source.'" *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002) (quoting *Two Pesos*, 505 U.S. at 768). "Trade dress, like trademarks, are classified in the following categories of generally increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Savant Homes*, 809 F.3d at 1147 (citing *Two Pesos*, 505 U.S. at 768). Of these five categories, only suggestive, arbitrary, and fanciful trade dress are inherently distinctive.[1]

Domo's amended complaint does not assert that Domo's trade dress is inherently distinctive. Nor does it assert that the trade dress is suggestive, arbitrary, or fanciful. Instead, Domo simply asserts that "the Domo Trade Dress has become an asset of substantial value to Domo as a distinctive indication of the origin and quality of the Domo Platform" and that "Grow copied the distinctive Domo Trade Dress." ECF No. 4 at ¶¶ 35, 39. But Domo's conclusory use of the word "distinctive," absent any factual allegations, is insufficient to adequately allege inherent distinctiveness.[2]

---

[1] "A suggestive trade dress or trademark subtly connotes something about the product. . . . [A] trade dress or trademark that is fanciful or arbitrary bears no relationship to the products or services with which it is associated." *Savant Homes*, 809 F.3d at 1148 (citation and internal quotation marks omitted).

[2] Domo argues that the assumption that its trade dress is not inherently distinctive is "mistaken," and in support it cites factual allegations in ¶¶ 32, 34, and 35 of its amended complaint. ECF No. 29 at 9. But nothing in those paragraphs or in the screenshots of the product suggests that Domo's trade dress is so original or unique as to make it inherently source-identifying.

## 2. Secondary Meaning

"To acquire secondary meaning, a trade dress 'must have been used so long and so exclusively by one producer with reference to his goods or articles that, in the trade and to that branch of the purchasing public, the [trade dress] has come to mean that the article is his product.'" *Savant Homes*, 809 F.3d at 1148 (quoting *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1154 (10th Cir. 2013)). "Put differently, secondary meaning exists when 'in the consumer's mind the [trade dress] denotes a single thing coming from a single source.'" *Id.* (quoting *Sally Beauty Co.*, 304 F.3d at 978). Secondary meaning may be established from consumer testimony or consumer surveys, the length and manner of the use, the nature and extent of advertising and promotion of the trade dress, the efforts made to promote a connection in the public's mind between the trade dress and a particular product, actual consumer confusion, intentional copying, and volume of sales. *Id.* Although at this stage it is not necessary to make "heightened fact pleading of specifics," Domo must nonetheless allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 547. Much of the information that courts use to evaluate a trade dress's secondary meaning is naturally in possession of the plaintiff rather than the defendant. Accordingly, the plaintiff should know and allege some essential facts even without the benefit of discovery.

In a recent case, a New York district court dismissed a trade dress infringement complaint by a martial arts school against a competitor. The complaint alleged "extensive . . . web presence" with "hundreds of websites," "thousands of man hours, and significant amounts of money" expended, and it recited a number of the website features copied by the infringer. *FC Online Mktg., Inc. v. Burke's Martial Arts, LLC*, No. 14-cv-3685, 2015 WL 4162757, at *9 (E.D.N.Y., July 8, 2015). The district court held that "the amended complaint is bereft of any factual allegations, other than plaintiff's conclusory allegations, from which it may reasonably be

inferred that plaintiff's 'Web Presence' has acquired secondary meaning in the relevant market," and hence "it fails to state a plausible claim of trade dress infringement with respect to plaintiff's Website." *Id*. at \*10.

Similarly, trade dress infringement allegations were dismissed in *AJB Enters., LLC v. Backjoy Orthotics, LLC*, No. 3:16-cv-00758, 2016 WL 7341702, at \*5 (D. Conn., Dec. 18, 2016). There, the plaintiff marketed a cane massager for over twenty years and used the trade dress in "widespread sales" and advertising. *Id*. at \*5. The court ruled that "[a]n extensive and successful history of selling and advertising the product, without more . . . is not sufficient to demonstrate that the claimed trade dress has secondary meaning for purposes of a trade dress infringement claim." *Id*. However, the court allowed the amended complaint to proceed after the plaintiff alleged that it spent $500,000 in advertising on Amazon, Google, and Facebook, recited extensive video promotions on YouTube and the plaintiff's own website, and included the statement from a Facebook cofounder who provided "an unsolicited, unpaid and enthusiastic testimonial for the strangely shaped massage device he swears by." *AJB Enters., LLC v. Backjoy Orthotics, LLC*, No. 3:16-cv-00785, 2017 WL 4400746, at \*2 (D. Conn., Sep. 29, 2017).

Domo alleges that its product has been advertised, marketed and sold nationwide and throughout the world and has continuously featured a number of common design elements. ECF No. 4 at ¶¶ 31–32, 36. Domo also submits a screenshot of its product, recites the product's various visual elements, and asserts that its business intelligence software was the first of its kind. But these allegations are generic. There is nothing in them that would not apply to virtually any new business that advertises and otherwise promotes its product.

Continuous marketing is a prudent business practice, but it hardly warrants an inference that a business achieved such recognition that in the consumer's mind its trade dress means a

single thing coming from a single source. And the duration of Domo's product marketing is unclear from the pleadings. The court can ascertain only that the Domo platform has been marketed for at least four years, since 2013, when Nelson became the target of Domo's advertising. A four-year marketing campaign is not overwhelmingly long. Such duration alone does not suggest with any degree of plausibility that consumers learned to associate the products' visual elements exclusively with the Domo trade dress. Moreover, the facts alleged in this case indicate a rather limited advertising strategy adopted by Domo. In fact, "Domo's practice is to provide demonstrations only to individuals that it believes are genuinely interested in becoming customers." ECF No. 4 at ¶ 14. Consequently, Nelson was only allowed to review the product after he represented himself as an agent for a potential buyer. Such secrecy might not be entirely inconsistent with the widespread customer recognition of Domo's trade dress, but without additional facts, it does little to reinforce the plausibility of such recognition. Domo also does not allege any facts about the volume of sales, actual consumer confusion, or instances of intentional copying. Without more facts, recitation of a common business strategy in support of the notion that the product has acquired secondary meaning is merely conclusory.

### B. NON-FUNCTIONALITY

It is well established that "trade dress protection may not be claimed for product features that are functional." *Traffix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). "[A] functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *Id.* at 32 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)). Consequently, plaintiffs seeking trade dress protection must allege that the protected features are non-functional. However, Domo does not sufficiently allege non-functionality.

The elements of the Domo trade dress are listed in ¶ 32 of Domo's amended complaint. The complaint further states that "each of . . . [those] features constitute [sic] a design choice not driven solely by function." ECF No. 4 at ¶ 33. This statement constitutes the complaint's sole evidence that the listed elements are non-functional. It is not self-evident why some of them are. For example, Domo recites as parts of its trade dress,

> a. a dashboard made up of numerous individual tiles or "cards";
> b. each card on the dashboard is rectangular in shape;
>  . . .
> e. individual cards use green arrows to indicate an increase in the summary number and red arrows to indicate a decrease in the summary number;
>  . . .
> g. individual cards feature a title in the top left corner of the card;
> h. individual cards can be reduced and enlarged in size based on user preference;
> i. individual cards can be interchanged to any location on the dashboard[.]

ECF No. 4 at ¶ 32. Individual elements of a software interface being movable, rectangular in shape, and having a title in the top left corner (where, in English, text generally begins by default) are hardly uncommon in the computer industry. Arrows indicating changes in the balance are also common. The design of the arrows is very different in Grow's product, where it is a simple triangle. And completely precluding competitors from the use of arrows would diminish competing products' functionality tremendously. Domo does not explain why foreclosing competitors from using rectangular movable/collapsible cards and arrows to indicate upward or downward changes would not put them at a disadvantage.

"[F]eatures are deemed functional until proved otherwise by the party seeking trade dress protection." *Traffix Devices*, 532 U.S. at 30. Because Domo has to state a claim to relief that is plausible on its face, and because Domo possesses all the facts about its product, simply making a conclusory statement that its "features constitute a design choice not driven solely by function" is not sufficient to meet the *Iqbal* standard under Rule 12(b)(6). The court acknowledges that its

"inquiry is not addressed to whether individual elements of the trade dress fall within the definition of functional, but to whether the whole collection of elements taken together are functional." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987). Nonetheless, it is incumbent upon the plaintiff to allege, in more than a conclusory fashion, that the trade dress taken as a whole is non-functional.

Domo cites *E.P. Lehmann Co. v. Polk's Modelcraft Hobbies, Inc.* for the proposition that functionality is a question of fact that cannot be dismissed under 12(b)(6) motion. 770 F. Supp. 202, 205 (S.D.N.Y. 1991). The court disagrees and notes that the *Lehmann* decision was issued before *Twombly* and *Iqbal* clarified that pleadings reciting legal conclusions or naked assertions are insufficient. Presently, even courts in the circuit where *Lehmann* was decided do not accept that non-functionality is shielded from the *Iqbal* standard: "[T]he failure to plead non-functionality with factual particularity establishes merely the possibility and not the plausibility of [relief] and is therefore fatal to Plaintiff's trade dress claim." *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 746–47 (D. Conn. Apr. 25, 2014) (quoting *ID7D Co., Ltd. v. Sears Holding Corp.*, No. 3:11-cv-1054, 2012 WL 1247329, at *7 (D. Conn. Apr. 13, 2012)). As in the instant case, the plaintiff in *Mike Vaughn* alleged that it "developed a signature trade dress . . . featuring non-functional elements." *Id.* The court held that "[t]hose allegations are conclusory and therefore not entitled to the presumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 663). Similarly, Domo's assertion that its "features constitute a design choice not driven solely by function" is merely conclusory and cannot satisfy the *Twombly-Iqbal* standard.

Domo also cites *Lepton Labs, LLC v. Walker*, where a California district court noted that "it is . . . difficult to require the plaintiff to essentially prove—as opposed to simply allege—that its trade dress satisfies all of the essential elements at the pleading stage." 55 F. Supp. 3d 1230,

1240 (C.D. Cal. 2014). Accordingly, in its Opposition to Motion to Dismiss, Domo asserts that the list of elements of its trade dress "unquestionably satisfied the plaintiff's pleading obligations." ECF No. 29 at 11. Domo essentially contends that a description of the appearance of its product obviates the need to allege any facts about the non-functionality of that appearance. The court cannot agree with such an approach because it is inconsistent with the first step of the *Iqbal* analysis where "naked assertion[s]" devoid of "further factual enhancement" must be read out of the complaint.

In sum, Domo's trade dress infringement claim fails to allege sufficient facts regarding distinctiveness and non-functionality of the trade dress.

## IV. PATENT INFRINGEMENT

### A. DECIDING PATENT ELIGIBILITY ON A MOTION TO DISMISS

"Patent eligibility under 35 U.S.C. § 101 is a question of law." *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016). The Federal Circuit "[has] repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *FairWarning IP, LLC v. Iatric Sys.*, 839 F.3d 1089, 1097 (2016) (citing *Genetic Techs.*, 818 F.3d at 1373–74).

The asserted claim 1 of the '740 patent is directed at a computer-implemented process of displaying data using stacked bar graphs. Grow contends that the process of claim 1 is an abstract idea and that such ideas are unpatentable subject matter under § 101. *See Alice Corp. Pty. Ltd. V. CLS Bank Intern.*, 134 S. Ct. 2347, 2354 (2014).

Domo argues that the court should not reach the § 101 question without the benefit of claim construction. It contends: "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes before a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." ECF No. 29 at

18–19 (quoting *InsideSales.com, Inc. v. SalesLoft, Inc.*, No. 2:16-cv-859, 2017 WL 2559932, at *3 (D. Utah, June 13, 2017)). However, there is no record before the court indicating that claim construction is at issue in this case or that any terms of the '740 patent are ambiguous. Accordingly, the court sees no obstacle to performing the § 101 analysis upon this Rule 12(b)(6) motion.

Domo further contends that because it does not concede that the business practice covered in its '740 patent "was 'well-known' or 'longstanding' prior to the invention[,] … there exists a factual dispute over which inferences must be drawn in favor of the non-movant on a motion to dismiss." ECF No. 29 at 19. In support of this contention, Domo analogizes the instant case to *InsideSales.com*, where the court "denied a motion to dismiss under § 101 of the Patent Act due to a lack of evidence that the patented computer-related technology was merely the embodiment of a well-known business practice." ECF No. 29 at 19–20 (citing *InsideSales.com*, 2017 WL 2559932 at *3). Domo is correct that if a fact is not conceded, the inferences must be drawn in the non-movant's favor. If the instant case turned on whether displaying data using stacked bar graphs in the way covered in the '740 patent was a well-known business practice, this court would deny Grow's 12(b)(6) motion. However, this case is distinguishable from *InsideSales.com* because Grow does not allege that what Domo patented was a "well-known" or "longstanding" practice.

Instead, Grow asserts that the invention is an abstract idea,[3] so whether the '740 patent was well-known or longstanding is irrelevant. Requiring that an abstract idea be a well-known or longstanding practice would conflate § 101 jurisprudence with the § 102 novelty and the § 103 non-obviousness requirements. The unpatentability of abstract ideas under § 101 is a doctrine

---

[3] *See* ECF No. 23 at 24 ("Here, claim 1 is directed to an abstract idea because it merely adds conventional computer components to perform a basic concept – graphically displaying data in an organized way.").

that is distinct from the novelty of the invention. Even though the Supreme Court in *Alice* intermingled novelty into its § 101 analysis in finding that shadow credit and debit records represented "a fundamental economic practice long prevalent in our system of commerce," 134 S. Ct. at 2350, the Federal Circuit has not interpreted *Alice* as requiring that an abstract idea must be part of a well-known business practice. Therefore, the court will not impose such a requirement. A mathematical abstraction would not be patentable regardless of how little it is known in practice or how recently it has been conceived.

Because there is no issue of patent claim construction, and because Grow does not base its motion on what has been known in the industry, the court can decide the patent claim validity on the basis of the pleadings before the court and the text of the patent itself.

## B. PATENT-ELIGIBLE SUBJECT MATTER UNDER 35 U.S.C. § 101

Domo alleges that its software is protected by the '740 patent. But Grow contends that Domo's software is not patent eligible. Certain categories of subject-matter are patent-eligible: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101.

"In interpreting this statutory provision, the Supreme Court has held that its broad language is subject to an implicit exception for 'laws of nature, natural phenomena, and abstract ideas,' which are not patentable." *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017) (citing *Alice Corp.*, 134 S.Ct. at 2355). In *Alice*, the Supreme Court formulated a two-step test to determine whether the invention falls under this exception. "Specifically, a court must determine: (1) whether the claim is directed to a patent-ineligible concept, i.e., a law of nature, a natural phenomenon, or an abstract idea; and if so, (2) whether the elements of the claim, considered 'both individually and as an ordered combination,' add

enough to 'transform the nature of the claim into a patent-eligible application.'" *Id.* (quoting *Alice*, 134 S. Ct. at 2355). Under the second step, a "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. In other words, "[s]tating an abstract idea while adding the words 'apply it' is not enough for patent eligibility." *Id.* (internal quotation marks omitted). Applying both *Alice* steps to claim 1 of the '740 patent, the court concludes: (1) the claim is directed at a patent-ineligible abstract idea that aligning segments of stacked graphs improves its perception by a user; and (2) the claim is implemented on a generic computer.

Claim 1 of the '740 patent reads:

1.      A computer-implemented method for presenting a graph displaying a plurality of data entries in graphical form, each data entry having a value, the method comprising:

displaying a first graph on a display screen, the first graph portraying a plurality of quantitative data entries having a plurality of baseline values;

at an input device, receiving first user input invoking a realigned graph and specifying a baseline value; and

responsive to the first user input, displaying, on the display screen, a realigned graph wherein each of at least a subset of the data entries is repositioned to a location corresponding to the specified baseline value,

wherein each of the first graph and the realigned graph comprises a bar graph,

wherein the first bar graph comprises at least two composite data entries, each composite data entry comprising a bar having at least two segments, and wherein at least a first segment of a first composite data entry is of a common kind with at least a second segment of a second composite data entry, and wherein the first and second segments are not aligned with one another; and

wherein displaying the realigned bar graph comprises displaying a realigned graph wherein the first and second segments are aligned with one another.

'740 patent, col. 13 ll. 54-67, col. 14 ll. 1-10.

## 1. Step 1: "Abstract Idea"

First, the court asks whether the claim is directed to a patent-ineligible concept. As the Federal Circuit clarified in *Enfish, LLC v. Microsoft Corp.*, in step 1 courts "cannot simply ask

whether the claims *involve* a patent-ineligible concept." 822 F.3d 1327, 1335 (Fed. Cir. 2016). Essentially every patent-eligible claim involves a law of nature, a natural phenomenon, or an abstract idea. Rather, the court must determine whether claims' "character as a whole is directed to excluded subject matter." *Id*. (quoting *Internet Patents Corp. v. Active Network, inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)). Describing the claims at a too high level of abstraction and "untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Id*. at 1337. Therefore, at step 1 the court must analyze the character of the invention as a whole in view of the specific language of the claims.

Domo analogizes the instant case to *Trading Techs. Int'l, Inc. v. CQG, Inc.*, where a software invention was found to be directed at a patent-eligible idea. 675 Fed. App'x 1001 (Fed. Cir. 2017). There, the Federal Circuit upheld the validity of patents that claimed software for quick trading on the electronic stock exchange. *Id*. at 1002–03. Because modern stocks are listed and traded electronically, stock prices can change very rapidly, and a trading bid can be "executed at different prices than intended." *Id*. at 1002. The invention in *Trading Techs* addressed this problem "specifically arising in the realm of computer networks." *Id*. at 1005 (quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014)). Consequently, the Federal Circuit upheld the district court's reasoning that "these patents are directed to improvements in existing graphical user interface devices that have no pre-electronic trading analog, and recite more than setting, displaying, and selecting data or information that is visible on the graphical user interface device." *Id*. at 1004 (internal quotation marks omitted).

The '740 patent at issue differs significantly from the patents in *Trading Techs*. Claim 1 of the '740 patent describes an improvement on displaying bar graphs containing multiple datasets. In the simplest embodiment shown below that falls under the scope of claim 1, a "First

Graph" displays the population of a hypothetical city in 1985 and 2015, split into child and adult populations ("a plurality of data entries").



Each stacked bar represents a "composite data entry" having "at least two segments" showing both the adult population (white segment) and the child population (shaded segment). Because white segments have the same baseline, ascertaining the relative increase in the adult population from 1985 to 2015 is straightforward. But, as pointed out in the specification of the '740 patent, the change in the child population is less clear because the shaded segments start from different baseline values. However, displaying the child population data alone, without simultaneously showing the adult data, improves the human perception of the child data, as both shaded segments are now realigned to the same baseline.



It is now somewhat easier to see that the population of children has decreased with time. So far, there is no inventive concept involved. On the contrary, the concept at issue is familiar to

children given building blocks of different lengths: Human perception of objects' relative length is improved when the objects are aligned.

A stacked bar graph is a composite construct that allows displaying multiple data entries at the same time. A stacked bar graph is a more compact and sophisticated way to present data compared with a non-stacked bar graph (like the "Realigned Graph 1" above). Naturally, there is a disadvantage to using stacked bar graphs. Stacked graphs allow cramming more datasets into a single graph. But, as a result, the convenience of viewing each dataset might be diminished compared with a setup where each dataset is displayed individually.



While "the Realigned Graph 1" is not yet within the limitations of claim 1 (its baseline value is chosen by default rather than specified by the user), "Realigned Graph 2" falls well within those limitations. Namely, claim 1 encompasses situations where a user chooses at which height the realigned segments are displayed ("user input . . . specifying a baseline value"). For example, instead of positioning the shaded segments at the bottom of the graph (as in "Realigned Graph 1" above), they can be positioned anywhere inside the bar. Indeed, tracking the actual claim language, "the first bar graph comprises at least two composite data entries" (city population in two different years each further subdivided into adult and child populations), "each composite data entry comprising a bar having at least two segments" (white and shaded segments), "and wherein at least a first segment of a first composite data entry is of a common

kind with at least a second segment of a second composite data entry" (the shaded segments are of a common kind as both correspond to the child population), "and wherein the first and second segments are not aligned with one another" (shaded segments begin at different heights). Also, "the realigned bar graph, comprises displaying a realigned graph wherein the first and second segments are aligned with one another" (shaded segments start from the same baseline in the realigned graph).

Stepping back from the actual computer-based implementation of the realignment (which is the subject of the step 2 inquiry), claim 1 is so broad as to cover any method that, upon receiving a user's request ("input") and a user-specified baseline value, displays the segments starting from that baseline value. However, the notion that the relative heights of the two shaded segments can be equally well ascertained when they are positioned at some common but arbitrary baseline is a basic geometric idea: Moving objects does not change their dimensions.

Invoking *Enfish*, Domo asserts that the '740 patent "does not claim an abstract idea" and that "the second-step analysis does not make much sense here." ECF. No. 29 at 23. However, the instant case is different from *Enfish*. There, the claims were "directed to a specific implementation of a solution to a problem in the software arts." *Enfish*, 822 F.3d at 1339. Likewise, the patents in *Trading Techs* were directed at trading devices that addressed a problem specifically arising in the context of electronic trading. 675 Fed. App'x at 1002–03. In contrast, the '740 patent specification in the case at bar does not identify any problem in the software arts that this invention purports to solve. There is also no indication that realigning segments represents a technological challenge or that it cannot be done with routine software (as the court has done in this opinion). Rather, the invention "allows the realigned segments to be more easily

compared with one another." '740 patent, col. 2 ll. 26–27. In the instant case, a computer is merely a convenient and efficient platform for generic data presentation.

Therefore, the court holds that claim 1 of the '740 patent is directed to the patent-ineligible abstract idea that repositioning segments of a stacked bar graph can enhance perception of their relative values.

## 2. Step 2: "Inventive Concept"

When a claim is directed to a patent-ineligible concept, the analysis must proceed to the "inventive concept" step. *Intellectual Ventures*, 850 F.3d at 1338. "For that step we look with more specificity at what the claim elements add, in order to determine whether they identify an inventive concept in the application of the ineligible subject matter to which the claim is directed." *Id.* (internal quotation marks omitted). The focus is now on whether specific claim language recites elements that limit the abstract idea with something more than simply "[s]tating an abstract idea while adding the words 'apply it with a computer.'" *Alice*, 134 S. Ct. at 2350. "Simply appending generic computer functionality to lend speed or efficiency to the performance of an otherwise abstract concept does not meaningfully limit claim scope for purposes of patent eligibility." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (en banc), *aff'd*, 134 S. Ct. 2347.

In *Trading Techs*, where the Federal Circuit upheld the validity of the trading software patent, the court identified the static price index as an inventive concept that allows traders to place trades more efficiently and accurately by using the patented electronic trading system.[4] 675 Fed. App'x at 1002–04.

---

[4] The claims in the *Trading Tech* patent recited specific software components, such as a plurality of indicators in a bid display region, a plurality of indicators in an ask display regions, and a static price axis. 675 Fed. App'x at 1003. In contrast, no software elements are found in claim 1 of the '740 patent beyond the description of the data and its graphical images.

In *BASCOM Global Internet Servs. v. AT&T Mobility LLC*, at issue was a software patent directed at solving a problem of website filtering that specifically arises in the internet context (for example, filtering out entertainment websites while still allowing employees to access work-related sites and at the same time preventing tampering with the filters by computer-literate end-users). 827 F.3d 1341 (Fed. Cir. 2016). Prior art described one of the two possibilities: (1) filtering done on the local end-user machines (with the disadvantage of being susceptible to user tampering), or (2) filtering done by remote servers (with the drawback of lacking customizability for different end-users). *Id.* at 1343–44. "The inventive concept described and claimed in the . . . patent [was] the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Id.* at 1350. The Federal Circuit found that "filtering content is an abstract idea because it is a longstanding, well-known method of organizing human behavior," and that claims recited generic "local client computer," "remote ISP server," "Internet computer network," and "controlled access network accounts." *Id.* at 1348–49. However, the court found an inventive concept "in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.* at 1350. In particular, *BASCOM* claims "recite[d] a specific, discrete implementation of the abstract idea of filtering content." *Id.*

In the instant case, Domo argues that rather than being directed to an abstract idea of displaying data, "[t]he claims are drawn to a particular dynamic and interactive tool for the improved computer-aided presentation of data." ECF No. 29 at 20. However, the limitations that refer to the implementation of the abstract idea are quite generic rather than specific and discrete. In addition to the limitation that the method of claim 1 is "computer-implemented," there is only recitation of "a display screen" for showing graphs and a generic "input device" to receive a user's request for the realignment of data. According to the specification, "[i]nput device . . . can

be any element that receives input from user . . . including, for example, a keyboard, mouse, stylus, touchscreen, touchpad, trackball, accelerometer, five-way switch, microphone, or the like." '740 patent, col. 4 ll. 21–24. "Display screen . . . can be any element that graphically displays quantitative data." '740 patent, col. 4 ll. 26–28. Hence, these limitations encompass virtually every existing computer and identify no additional inventive concept other than "apply it with a computer." The instant case cannot be analogized with *BASCOM*. Claim 1 of the '740 patent fails to describe any non-conventional and non-generic arrangement of known, conventional pieces. Instead, claim 1 of the '740 patent simply implements on a generic computer with a display and an input device the simple concept that aligned data segments are easier to compare than non-aligned segments.

Therefore, the court holds that the method of claim 1 is invalid as directed to a generic computer-based implementation of an abstract idea.

## V.    ORDER

For the reasons stated above:

1.  The trade dress infringement claim is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted.[5]

2.  The patent infringement claim is **DISMISSED WITH PREJUDICE** because claim 1 of the asserted '740 patent is invalid.

3.  The court has dismissed both of Domo's federal claims. Accordingly, the remaining state-law claims of fraud, tortious interference, unfair competition, and deceptive trade practices are **DISMISSED WITHOUT PREJUDICE FOR LACK OF**

---

[5] At oral argument, Domo moved the court for leave to amend its complaint. However, DUCivR 15-1 requires that parties moving under Rule 15 to amend a complaint must attach a proposed amended complaint as an exhibit to the motion for leave to file. Consequently, oral motions to amend (particularly when the moving party does not submit a proposed amended complaint) are improper under the local rules. Accordingly, the court does not consider Domo's oral motion here.

**SUBJECT-MATTER JURISDICTION.** 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction . . . .").

4. The clerk of the court is instructed to close the case.


Signed May 9, 2018

BY THE COURT

_____
Jill N. Parrish
United States District court Judge